IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

**BONNER'S ACOUSTICAL, INC.**
**CONTRACTORS**

       **Plaintiff,**

v.                                                                                    CV 09-PT-231-M

**CONTINENTAL INSURANCE CO.,**
et al

       **Defendants.**

## MEMORANDUM OPINION

This cause comes on to be heard on Motion for Summary Judgment of Defendant Continental Insurance Company (doc. 36) filed on October 5, 2009, Motion for Summary Judgment (doc. 37) filed by defendant Harleysville Insurance Company on October 5, 2009 and Motion for Summary Judgment (doc. 39) filed by plaintiff on October 5, 2009.[1]

### Summary Judgment Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©.  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting

---

[1] The court will refer to one of the defendants as both Continental Insurance Company and Fidelity Casualty Company of New York.

evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp.*, 281 F.3d at 1224 (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

"[A]t the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986).  However, judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such character that it would warrant the jury finding a verdict in favor of that party.  *Id.* at 251 (*quoting Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872)).  "This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250.

Facts

Undisputed Facts

1. In 1992, Richard and Bekki Woodall contracted with Bonner's to install an Exterior Insulation and Finish System ("EIFS") to their home at 1669 Buckhorn Road in Munford, Alabama. The EIFS installation was complete by 1993.

2. In 2003, the Woodalls, for the first time, noticed water intrusion in their home. Ken Bonner of Bonner's inspected the Woodalls' home and advised the Woodalls to have the house caulked.

3. On or about August 2, 2004, the Woodalls filed suit against Bonner's and others in the Circuit Court of Talladega County ("the underlying suit"). The Woodalls alleged breach of express warranty, breach of implied warranty, negligence, wantonness, misrepresentation, suppression, deceit, and breach of contract.

4. Between 1990 and 1995, Bonner's held liability coverage from defendant Fidelity & Casualty Company of New York (sued under the misnomer "Continental Insurance Company"). The Fidelity & Casualty insurance policy covered damages arising from "bodily injury" or "property damage" caused by an "occurrence" taking place within the policy period and defense of lawsuits seeking such damages. The policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful condition." The policy excluded from coverage any bodily injury or property damage arising out of work already completed by the insured and occurring away from premises owned or rented by the insured (the "products-completed operations hazard" provision). (NOTE: No party has been able to locate a copy of the 1992/1993 Fidelity & Casualty policy, but circumstantial evidence suggests that the 1992/1993 policy is consistent in relevant part with the other policies which have been

produced).

5. Between 1995 and 2001, Bonner's held liability coverage from Harleysville Insurance Company. The Harleysville policy also covered damages arising from "bodily injury" or "property damage" taking place during the policy period and caused by an "occurrence." The policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Harleysville policy excluded from coverage any bodily injury or property damage under the "products completed operations" exclusion and/or arising out of the insured's work involving the application of EIFS.

6. Upon being notified of the underlying suit, both Fidelity & Casualty and Harleysville undertook representation of Bonner's subject to a reservation of rights. However, in the Spring of 2008, following discovery in the underlying suit, both insurance carriers withdrew their defense of Bonner's and denied coverage of any damages arising from the underlying suit.

Disputed Facts

1. The expert witness designated by Plaintiff, Joel Wehrman, testified that the water intrusion to the Woodalls' home began within six months to one year of the completion of the home and that such water intrusion would have led to substrate damage within two to three years of the home's completion. The defendant insurers dispute the conclusions drawn from this testimony.

Contentions of Bonner's

1. That Fidelity & Casualty and/or Harleysville have a duty to defend and indemnify Bonner's in the underlying suit because the water intrusion to the Woodalls' home constituted damage caused by an "occurrence" within the time period covered by the insurers' policies.

2. That the "occurrence" causing damage took place beginning within a year after the home was completed, not when the Woodalls first discovered the damage in 2003.

3. That there is no relationship between when an "occurrence" takes place and when a cause of action for negligence accrues.

## Contentions of Fidelity & Casualty

1. That the Woodalls' claims in the underlying suit are not covered by Fidelity & Casualty's liability policy because Bonner's did not purchase completed operations coverage. Rather, the policy that Bonner's purchased explicitly excluded from its scope of coverage any property damage or injury arising out of work already completed and taking place away from premises owned or rented by the insured.

2. That the Woodalls' claims in the underlying suit are not covered by Fidelity & Casualty's liability policy because there is no evidence that any damage occurred within the period covered by the policy (i.e. 1990-1995). Rather, the earliest that Bonner's can show the occurrence of damage is in 2003, when the Woodalls first discovered water intrusion in their home.

## Contentions of Harleysville

1. That the Woodalls' claims in the underlying suit are not covered by Harleysville's liability policy because the Woodalls suffered no damage during the period covered by the policy (i.e. 1995-2001). Rather, the date of damage for all counts in the Woodalls' complaint is 2003, when they first discovered water intrusion in their home. The date of "occurrence" as defined by the Harleysville policy is also 2003.

    2. Even if the trier of fact were to accept Bonner's expert Joel Wehrman's testimony that damage to the home occurred within six months to a year from the completion of construction, the Woodalls' claims still would not be covered by the Harleysville's policy, which did not come into effect until May 1995.  Construction of the home was completed in either November 1992 (Ron Bonner's recollection) or November 1993 (the Woodalls' recollection).

    3. Even if an "occurrence" causing damage took place during the policy period, coverage of the Woodalls' claims would be excluded by an endorsement exclusion for EIFS contained in the Harleysville policy, which specifically excludes from coverage any property damage or bodily injury included in the "products completed operations" exclusion and/or arising from the insured's work involving the application of EIFS.

## Discussion

    Arguably, the defendant Harleysville cannot be held liable to Bonner's for one or more reasons.  First, if the occurrence date is 2003, there was no coverage by Harleysville in 2003. Second, if the occurrence date is 1993 or 1994 Harleysville's first policy was not effective until 1995.  Third, Harleysville's policy excluded EIFS damage.  Fourth, the completed operations exclusion.  Arguably, the defendant Continental cannot be held liable because of the completed operations provision and that the occurrence was in 2003 after its policies had terminated.

    As a general matter, the plaintiff and both defendants all agree that this case is controlled by *Liberty Mutual Ins. Co. v. Wheelwright Trucking Company*, 851 So.2d 466 (Ala. 2002). In *Liberty Mutual Ins. Co. v. Wheelwright Trucking Co., Inc.*, 851 So.2d 466 (Ala. 2002), Wheelwright Trucking purchased 44 Trailers manufactured by Dorsey Trailers, Inc.  The purchase was based on a contract specifying that the trailers be suitable to haul concentrated

loads of 50,000 pounds. Wheelwright began using the trailers in December of 1994, but did not attempt to haul 50,000 pound loads on any of the trailers for several years. In July of 1999 one of the Dorsey trailers buckled during an attempt to load a 47,000 pound steel coil, and another of the trailers proved unable to haul the coil on the following date. In 1998 and 1999 two more of the trailers experienced rollovers which were attributed to design defects. In October of 1999 Wheelwright discovered cracking on one of the trailers and subsequent inspection indicated similar cracking on 43 of the 44 trailers, whereupon Wheelwright removed all 44 Dorsey trailers from service.

Liberty Mutual insured Dorsey for two consecutive policy periods, from May 1, 1994 through May 1, 1996.

Wheelwright sued Dorsey on November 8, 1999, and Dorsey tendered the action to Liberty Mutual and other carriers for defense and indemnity. Liberty Mutual filed suit seeking a declaration that it was not obligated to defend or indemnify. Wheelwright presented expert testimony from an engineer that the trailers had been defectively designed and that the cracking began shortly after they were put into use and then progressed with continued use over the next several years. He further testified that the cracks would have been discoverable, with appropriate inspection techniques, as early as 1995, even if the trailers had been used until that time only to transport loads of less than half the weight of the steel coils. He could not state a precise date on which the cracking began or when it would have been evident. *Id.* at 473.

The court summarized the issue to be decided as follows:

> The circuit court recognized, and the parties all acknowledge, that Wheelwright's *loss of the use of its tractors for hauling* the concentrated heavy loads of steel coils did not actually take place until July 1998. In light of this fact, we consider whether the circuit

> court's analysis of when the "occurrence" took place-i.e., that it was the continuous cracking of the trailers occurring as early as 1995, rather than the time of Wheelwright's *loss of use*-is appropriate under the applicable caselaw.  (Emphasis added).

*Id*. at 481.

The court stated that "[t]his court has stated that, as a general rule the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act is committed but the time the complaining party was actually damaged," *Id*. at 481 (citing *American States Ins. Co. v. Martin*, 662 So.2d 245m 250 (Ala. 1995) and *United States Fid. & Guar. Co. v. Warwick Development Co.*, 446 So.2d 1021, 1024 (Ala. 1984)).  The court reasoned that despite the fact that the cracks had been present and worsening in the trailers for years, there was no loss of use, and hence no damage, until the trailers actually failed.  The earliest the Woodalls (the homeowners) were aware of any problems with their home was in 2003, when they noticed water intrusion and called Ken Bonner to come and take a look.

Pertinent statements in *Wheelwright* include:

> "The circuit court recognized, and the parties all acknowledge, that Wheelwright's *loss of the use of its tractors* for hauling the concentrated heavy loads of steel coils did not actually take place until July 1998." *Id*., at 481.  (Emphasis added).

> . . . .

> "Thus, we can ascertain no logical requirement arising from the policy definition of an 'occurrence' as an 'accident' *for treating the continuous cracking of the trailers, rather than the ultimate failure of the trailers upon being loaded* with the heavy coils, as the 'occurrence' triggering coverage in this case." *Id*., at 481.  (Emphasis added).

> . . . .
>
> "The 'occurrence' in this case was not the cracking, but rather the failure of the trailers upon being loaded with the steel coils." *Id*., at 483.
>
> . . . .
>
> "As with the polices at issue in *American States* and *Prescott's Altama, supra*, the policies in this case all specify that they apply only to property damage that occurs within their respective policy periods. Because we conclude that the occurrence in this case is properly *viewed as Wheelwright's loss of the use of its tractors* because the Dorsey trailers could not haul steel coils and that that loss of use took place no earlier than July 1998, the policies of Liberty, GAN, and Federal had all expired before the occurrence. Accordingly, the circuit court erred in entering the summary judgments for Wheelwright against those insurers and erred in denying their respective motions for a summary judgment. *Id*., at 483. (Emphasis added).

*Wheelwright* tends to bolster the defendants' arguments. The problem is that *Wheelwright* and cases cited therein, at least partially, rely upon the nature of the *claimed* losses rather than just when some damage occurred.

The case of *U. S. Fid. & Guar. Co. v. Warwick Dev. Co., Inc.*, 446 So.2d 1021 (Ala. 1984) may throw additional light on the issue. In that case the Supreme Court of Alabama held (1) that a reliance on misrepresentations made by the contractor/seller of a home did not constitute an "occurrence" within the meaning of the general liability policy held by the contractor/seller, and (2) that, as a general rule, the time of an "occurrence" is the time when the complaining party was actually damaged, not the time when the act causing the damage was committed. 446 So. 2d 1021, 1023-24 (Ala. 1984). The Adams, purchasers of a home, sued

Warwick, the contractor/seller of the home, alleging multiple defects in the structure of the home. Warwick then sued its insurers, including United States Fidelity & Guaranty ("USF&G"), which had denied coverage under the policies held by Warwick. Summary judgment was granted to the other insurer, but the trial court found that USF&G was bound under its insurance policy to Warwick. The Alabama Supreme Court reversed. *Id.*

The USF&G insurance policy covered "property damage...caused by an occurrence." An "occurrence" was defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured." *Id.* at 1023. In the Supreme Court's view, the Adams' reliance on misrepresentations made by Warwick did not constitute an "occurrence" within the meaning of the USF&G policy. *Id.* Even if a misrepresentation could be an "occurrence," the Supreme Court found that in this case there was no evidence that any misrepresentation by Warwick *caused* physical injury or property damage to the Adams' home. *Id.* at 1024. The Supreme Court also held that, as a general rule, an "occurrence" is deemed to happen not when the wrongful act is committed but rather when the complaining party was actually damaged. *Id.* The court cited several cases for the proposition that the "occurrence" must have happened during the policy period, "for it is the insurance that is in force at the time of the property damage that is applicable rather than insurance that was in force when the work was performed." *Id.* For these reasons, the damage to the Adams' home was not covered by the USF&G policy held by Warwick.

It appears that the legal issue is whether, under Alabama law the date of the "occurrence" is the date when there was some water intrusion which may or may not have begun some damage to the house, *or* on the date when the Woodalls first discovered damage to the house. Unlike in

*Wheelwright* where the claimed loss did not occur until after the attempt to add weight to the loads, here, arguably, the loss may have begun in 1994 and accumulated thereafter. Regardless of the legal issue, there may be an issue as to the qualification of the expert. That issue, however, is not now before the court.

    The court will not now file an order or judgment, but will allow the parties to comment on the foregoing. Any such comments should be filed within ten (10) calendar days. The court will thereafter file an order and/or judgment and/or certify a legal issue to the Supreme Court of Alabama.[2]

    This the 3rd day of February, 2010.

                                                 **ROBERT B. PROPST**
                           **SENIOR UNITED STATES DISTRICT JUDGE**

---

[2] The court regrets the delay and the further concerns about the law. The issues are not, however, as clear as the parties would suggest. Any comments should address whether the court has misstated any contentions, facts or law. The parties should address the completed operations provisions.